PITTMAN, Judge.
Cyndi Booth appeals from a summary judgment entered in favor of Newport Television, LLC (“Newport”), by the Mo *721 bile Circuit Court. We reverse and remand.
In October 2008, Booth sued Newport, seeking a judgment declaring that a confidentiality, trade secrets, and noncompete agreement (“the noncompete agreement”) that she had signed while employed by Clear Channel Broadcasting, Inc. (“Clear Channel”), was invalid; Newport had purchased certain assets of Clear Channel, including the television stations that Booth was then working for, and subsequently became Booth’s employer. Additionally, Booth asserted a claim against Newport alleging tortious interference with business relations. Newport filed an answer denying Booth’s claims and asserted a counterclaim seeking a judgment declaring the validity of the noncompete agreement and Newport’s right to enforce the noncompete agreement. Booth denied the claim asserted against her by Newport.
In December 2009, Booth filed a motion for a summary judgment on her claim seeking a declaratory judgment. In January 2010, Newport responded in opposition and attached to its response the affidavit of Hamlet T. Newsom, Jr., a representative of Clear Channel.[1] Booth thereafter filed a reply to Newport’s response, as well as a motion to strike Newsom’s affidavit. Booth filed a supplemental reply in support of her motion for a summary judgment in June 2010.
Newport filed a motion for a summary judgment in October 2010 as to all claims (both Booth’s declaratory-judgment claim and her tortious-interferenee-with-business-relations claim, as well as its claim seeking a declaratory judgment). Booth responded in opposition in November 2010 and filed another motion to strike New-som’s affidavit. Newport thereafter replied to Booth’s response in opposition, as to which Booth filed a rebuttal in December 2010.
In January 2011, the trial court heard oral arguments for each summary-judgment motion and Booth’s motions to strike Newsom’s affidavit. The trial court thereafter denied Booth’s motions to strike and entered a summary judgment in Newport’s favor as to all claims. Booth timely appealed to the Alabama Supreme Court on January 20, 2011; the supreme court transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7.
The record reveals the following facts. Booth first signed a confidentiality, trade secrets, and noncompete agreement with Clear Channel in March 2004, and, shortly thereafter, she was hired as a sales associate at a television station owned by Clear Channel.[2] In November 2006, Booth signed the noncompete agreement at issue.
In April 2007, Newport purchased certain assets of Clear Channel, including WPMI and WJTC, the television stations for which Booth was then working. The terms of the sale were set forth in an asset-purchase agreement (“the purchase agreement”) entered into by Clear Channel and Newport. Newport contends that Booth was offered and accepted employment with Newport in April 2007. Newport also contends that, pursuant to the purchase agreement, Booth’s noncompete agreements were assigned to Newport.
*722 On September 80, 2008, Booth was offered a job by WKRG, a competitor of WPMI and WJTC (“the competing station”). Booth submitted a written letter of resignation to Newport, in which she did not indicate that she had been offered a job, or that she had accepted a job, with the competing station; the record indicates that Booth intended for that letter to be her “two-weeks notice.” In a letter dated October 1, 2008 (the day after the date of Booth’s resignation letter), Newport’s general counsel reminded Booth of the noncompete agreements she had signed in 2004 and in 2006. Booth contends that, at that time, a representative of Newport informed the competing station that it would file a lawsuit against the competing station and Booth if the competing station hired Booth; she alleges that, as a result, the competing station refused to hire her.
The record shows that Booth was employed by Newport until October 17, 2008. Newport contends that the general manager of WPMI and WJTC “urg[ed Booth] to reconsider” before eventually deciding to “accept[ her] resignation” on October 17, 2008, because Booth “would not commit to remaining employed with Newport.” Booth, however, asserts that she had told representatives of Newport “that she would not resign her position pending a determination by a court as to the enforceability of the non-compete agreement” but that Newport had, ostensibly, terminated her employment.
The trial court determined as a matter of law that the purchase agreement was ambiguous because, it held, it was unclear whether, pursuant to the terms of the purchase agreement, Booth’s employment contract or the noncompete agreement had been assigned to Newport, and, thus, whether Newport could enforce the non-compete agreement.
The relevant portions of the purchase agreement that identified and addressed the purchase of Clear Channel’s assets, which included its contracts, are as follows:
“[Article] 1.1. Station Assets. On the terms and subject to the conditions set forth in this agreement, at the Closing (as defined in Section 1.9), Seller [Clear Channel] shall sell, assign, transfer, convey and deliver to Buyer [Newport], and Buyer shall purchase and acquire from Seller, all right, title and interest of Seller in and to the Station Assets. ‘Station Assets ’ means all of the assets, rights and properties used or held for use exclusively on the ownership and operation of the Stations, including each of the following assets and properties of Seller, other than any such asset or property that is described in Section 1.2:
[[Image here]]
“(d) the following contracts, agreements and leases (including employment agreements, collective bargaining agreements, real property leases, income-producing leases and agreements for the sale of advertising time on the Stations) to which Seller is party (collectively, the ‘Station Contracts ’) and all rights thereunder (other than the Retained Party Rights (as defined in Section 1.5): (i) all contracts agreements and leases listed on Schedule 1.1(d) and (ii) all other contracts, agreements and leases that relate exclusively to the operation of the Stations or the ownership of the Station Assets, including without limitation those made between the date hereof and the Closing in accordance with Article 4....
[[Image here]]
“[Article] 2.8 Contracts. Schedule 1.1(d) sets forth a true and complete list of all contracts, agreements and leases that relate exclusively to the operation of the *723 Stations or the ownership of the Station Assets (including, without limitation, all contracts for the sale of advertising time, programming and film contracts, syndication contracts, national sales representation contacts, employment contracts, retrotransmission (must carry) contracts, distributions contracts and network affiliation contracts, collective bargaining agreements, Real Property leases, income-producing leases and agreements), other than
“(a) contracts for the sale of time on Stations which are for cash at rate card values consistent with prior practices for the periods in question and with not more than twelve (12) months remaining in their terms or “(b) contracts which were entered into in the ordinary course of business and (i) which are terminable on thirty (30) days’ notice or less without penalty or premium, or (ii) did not impose monetary obligations on Seller in 2006, and are not reasonably expected to impose monetary obligations on Seller in 2007, in excess of [redacted amount] and which impose no material restrictions on the operation of the Stations. The Station Contracts requiring the consent of a third party to assignment are identified with an asterisk on Schedule 1.1(d). Each of the Station Contracts (including without limitation each of the Real Property Leases) is in full force and effect and is binding upon Seller and, to Seller’s knowledge, the other parties thereto (subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors’ rights generally). Seller has performed its obligations under each of the Station Contracts in all material respects and is not in material default thereunder, and to Sellers knowledge, no other party to any of the Station Contracts is in default thereunder in any material respect.”
An extensive list of contracts, including specific employment contracts identified by the respective employee’s name, was set forth in Schedule 1.1(d) of the purchase agreement; neither Booth’s employment contract nor the noncompete agreement was listed. Upon its review of the above-quoted sections of the purchase agreement, the trial court concluded that the purchase agreement was ambiguous. The trial court stated:
“If station contracts assigned are listed on Schedule 1.1(d) as set out by Article 1.1(d) and Article 2.8 warrants that all contracts that relate exclusively to the operation of the stations are listed on Schedule 1.1(d), what purpose or effect is given Article l.l(d)(ii) which provides in the conjunctive that assigned contracts are all contracts that relate exclusively to the operation of the stations ?”
Upon determining that the purchase agreement was ambiguous, the trial court permitted Newport to submit parol evidence as to its meaning. At that time, Newport submitted Newsom’s affidavit, which stated that, pursuant to Article 1.1(d) of the purchase agreement, Newport had been assigned Clear Channel’s right to enforce the noncompete agreement.
On appeal, Booth contends (1) that the trial court erred in concluding, as a matter of law, that Newport had the authority to enforce the noncompete agreement and (2) that the trial court erred in entering a summary judgment in favor of Newport as to her tortious-interference claim. We address each issue in turn.
Summary judgment is appropriate when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *724 there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Rule 56(c)(8), Ala. R. Civ. P. Once a party seeking summary judgment demonstrates that there is no genuine issue of material fact, it then becomes the nonmoving party’s burden to present “substantial evidence” otherwise. Miller v. Archstone Communities Trust, 797 So.2d 1099, 1100-01 (Ala.Civ.App.2001) (citing Bass v. SouthTrust Bank of Baldwin Cnty., 538 So.2d 794, 798 (Ala.1989)). “Evidence is ‘substantial’ if it is of ‘such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Miller, 797 So.2d at 1101 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). This court is required to construe the record in favor of the nonmoving party and to “resolve all reasonable doubts against the [moving party].” Miller, 797 So.2d at 1101 (citing Manners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990)); see also Ex parte Neese, 819 So.2d 584, 587 (Ala.2001) (quoting Bechtel v. Crown Cent. Petroleum Corp., 495 So.2d 1052, 1053 (Ala.1986)).
We begin by addressing the summary judgment insofar as it declares that Newport has the authority to enforce the non-compete agreement against Booth. Booth’s argument is twofold. Booth argues that the trial court erred in determining that the purchase agreement between Newport and Clear Channel was ambiguous and that it was unclear whether, pursuant to the purchase agreement, Newport has been assigned the noncom-pete agreement; further, Booth asserts that Newsom’s affidavit, which was admitted as parol evidence to reconcile the perceived ambiguity, should have been struck from the record (as Booth had urged in her motion to strike). Additionally, Booth contends that, even if the trial court was correct in determining that the purchase agreement was ambiguous, it erred in ruling on the scope of the purchase agreement — i.e., whether the purchase agreement effected an assignment of the noncompete agreement — should have been determined by a jury. On the other hand, Newport argues that the purchase agreement was ambiguous, that the trial court therefore properly considered parol evidence as to the scope of the purchase agreement, and that, even if the purchase agreement was not ambiguous, the noncompete agreement was nonetheless assigned to Newport under the terms of the purchase agreement.
In interpreting a contract, a trial court must heed the following principles:
“If a contract is unambiguous on its face, there is no room for construction and it must be enforced as written. See Thompson Tractor Co. v. Fair Contracting Co., 757 So.2d 396, 398 (Ala.2000); Ex parte Hagan, 721 So.2d 167, 173 (Ala.1998). A court may not twist the plain meaning of the terms in the contract to create an ambiguity under the guise of interpretation. See [Universal Underwriters Life Ins. Co. v.] Dutton, 736 So.2d [564,] 570 [ (Ala.1999) ]. The primary source for deciding whether a contract is clear is the text of the document itself. ‘It is well established in Alabama that when an instrument is unambiguous its construction and legal effect will be based upon what is found within its four corners. The determination of whether an instrument is ambiguous is a question of law for the court to decide.’ Austin v. Cox, 523 So.2d 376, 379 (Ala.1988). Even if some ambiguity does exist in a contract, a court has the duty to accept a construction that will uphold the contract, rather than one that will make it invalid. See Wilson v. *725 World Omni Leasing, Inc., 540 So.2d 713, 716 (Ala.1989).”
Southland Quality Homes, Inc. v. Williams, 781 So.2d 949, 953 (Ala.2000).
In this case, the trial court reasoned that the purchase agreement was ambiguous because the purpose of Article l.l(d)(ii) was unclear in light of Article 1.1(d)(i) and Article 2.8. We disagree. The plain language of Article 1.1(d) provides that the contracts intended to be assigned to Newport are the contracts listed in Schedule 1.1(d) and “all other contracts ... that relate exclusively to the operation of the stations, or the ownership of the Station Assets, including ... those made between the date hereof and the Closing....” (Emphasis added.) The use of the word “other” to modify the term “contracts” in subsection (ii) of Article 1.1(d) implies that the category of contracts to which the subsection refers (which includes those “that relate exclusively to the operation of the Stations”) falls under the same category of contracts as those identified in subsection (i); the use of the word “other” indicates that the contracts listed on Schedule 1.1(d) are also contracts “that relate exclusively to the operation of the Stations.... ”
But for the use of the word “other” modifying the term “contracts” in subsection (ii), Article 1.1(d) could be interpreted broadly as identifying two categories of station contracts, if the subsections are read in isolation: those contracts listed in Schedule 1.1(d) and those contracts considered to “relate exclusively to the operation of the Stations, or the ownership of Station Assets.” However, the provisions of a contract are to be interpreted in context; specific provisions are not read in isolation. See Certain Underwriters at Lloyd’s, London v. Kirkland, 69 So.3d 98, 101 (Ala.2011).
In this case, Article 2 of the purchase agreement, in which Clear Channel sets forth its representations and warranties to Newport, prevents interpretation of Article 1.1(d) as identifying such separate categories of contracts; further, to ignore Article 2 would defeat the purpose of that entire article. Article 2.8 represents and warrants to Newport that Schedule 1.1(d) is a “complete list of all contracts ... that relate exclusively to the operation of the Stations or the ownership of the Station Assets.... ” Critically, not only does Article 2.8 reiterate that the contracts to be assigned are listed in Schedule 1.1(d), but it identifies the category of assigned contracts using language identical to that used in Article 1.1(d)(ii). Put simply, Article 1 of the purchase agreement outlines the categories of assets (including contracts) to be transferred to Newport, and Article 2 explains the substance of each category. Specifically, with regard to contracts, Article 1.1(d) provides that those contracts listed in Schedule 1.1(d) and “all other contracts ... that relate exclusively to the operation of the Stations....” are to be assigned to Newport; Article 2.8 merely explains what is encompassed in the category of contracts “that relate exclusively to the operation of the Stations....”[3]
In concluding that Article l.l(d)(ii) served an unclear purpose and thereby rendered the purchase agreement ambiguous, the trial court overlooked significant *726 language in that subsection intending to include contracts entered into between the date of the agreement and the closing.[4] To conclude that there was an ambiguity in the purchase agreement as to whether the noncompete agreement was being assigned would require us to ignore the clear, explicit language of Article 2.8, which uses precisely the same language as the language in subsection (ii) of Article 1.1(d) to identify the category of contracts to be assigned and states that “a complete” list of those contracts is set forth in Schedule 1.1(d). Therefore, Article l.l(d)(ii) clearly expresses the parties’ intent to include within the scope of the purchase agreement those contracts entered into between the date of the agreement and the closing that fall within those categories of contracts defined under Article 2.8 but could not be specifically identified in time to be included in Schedule 1.1(d).
Although we have determined that the purchase agreement was not ambiguous, we reject Newport’s contention that Article 1.1(d)(ii) “clearly”' contemplates that the noncompete agreement would be assigned to Newport. As we have explained, subsection (ii) of Article 1.1(d) refers to the contracts that “relate exclusively to the operation of the Stations.... ” that are identified in Article 2.8. Article 2.8 does not provide that those contracts are the ones listed in Schedule 1.1(d) and contracts that, “relate exclusively to the operation of the Stations....”; rather, it plainly states that the purchase agreement assigns those contracts listed in Schedule 1.1(d) and identifies the category of contracts that are listed on the schedule. It is evident that Article 2.8 was intended to provide Newport with a broad categorical overview of the types of contracts included in Schedule 1.1(d).[5]
Not only is it undisputed that Booth’s employment contract and noncompete agreement were entered into before Newport purchased Clear Channel’s assets, the fact that Booth’s employment contract is not included among the numerous employment contracts listed in Schedule 1.1(d) is telling.[6] Newport explains in its brief to this court that the contracts listed in Schedule 1.1(d) were the “actual contracts of employment with highly-compensated on-air talent, producers, etc. as opposed to ancillary employment agreements such as non-compete agreements, confidentiality agreements, etc.” It argues that Alabama law does not require that noncompete agreements be explicitly identified and named separately in the purchase agreement in order to effectuate their assignment. Although Newport is correct as to the law in this regard, its argument is misplaced. Regardless of whether the parties to the purchase agreement were required by law to identify noncompete agreements as being subject to the purchase agreement in order to effectuate an assignment of the noncompete agreements, the terms of the purchase agreement provided that the noncompete agreement was *727 required to be listed if it was intended to be assigned.
Because one would have to ignore the plain language of the purchase agreement in order to conclude that it is ambiguous, thereby warranting the admission of parol evidence, we conclude that the trial court erred (a) in determining that the purchase agreement was ambiguous, (b) in admitting and considering parol evidence, and (c) in ultimately concluding that, as a matter of law, Newport had been assigned the noncompete agreement and thus had the authority to enforce that agreement.[7]
Next, we consider whether the trial court erred in entering a summary judgment in favor of Newport on Booth’s claim that Newport had tortiously interfered with her business relationship with the competing station. Booth contends that Newport failed to demonstrate that there was no genuine issues of material fact as to whether it was justified in contacting the competing station and warning it that Booth had signed a noncompete agreement and that, if it hired Booth, it would be named (along with Booth) in a lawsuit to enforce the noncompete agreement against Booth.
In its summary-judgment motion, Newport asserted that it had been justified in contacting the competing station and that it had not wrongfully interfered with Booth’s relationship with the competing station. On appeal, Newport contends that the trial court’s entry of a summary judgment in its favor on Booth’s tortious-interference claim was proper because, it argues, the noncompete agreement had been assigned to it and the station with which Booth had been planning to work was its competitor. Thus, Newport maintains there was no unlawful restraint of trade and that any interference by Newport had been merely to advance its interests by enforcing the noncompete agreement against Booth.
The following elements must be shown “by substantial evidence” to establish a prima facie case of tortious interference with business relations: “(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.” White Sands Group, L.L.C. v. PRS II, L.L.C., 32 So.3d 5, 14 (Ala.2009). Both parties concede that Booth presented evidence as to each element sufficient to meet her burden of demonstrating a prima facie case of tor-tious inference. At issue is whether the trial court properly determined that no genuine issue of material fact existed as to whether Newport’s interference was justified and that, therefore, Newport was entitled to a judgment as a matter of law.
Newport first argues that evidence indicating that Newport wrongfully enforced the noncompete agreement against Booth is not enough, by itself, to sufficiently establish that Newport wrongfully interfered with her relationship with the competing station. Newport states that Booth’s failure to demonstrate that Newport had engaged in fraud, misrepresentation, physical violence, threats of illegal conduct, or similar conduct proves fatal to her claim because evidence of such conduct is a proper factor to be considered in determining whether Newport’s actions were justified. In support of that position, Newport relies on White Sands. We reject Newport’s argument. Newport had the burden to show that its actions were justified; Booth *728 had no burden to show that Newport’s actions were unjustified. Newport’s assertion that Booth was required to demonstrate fraud, misrepresentation, or similar conduct is baseless. In White Sands, the court opined that “[i]t would be ... illogical to require” a plaintiff to present evidence of fraud, force, or coercion in order to make a prima facie showing of tortious interference. 32 So.3d at 12. In fact, the court expressly stated that “the elements of the tort of wrongful interference with a business relationship do not include a showing of fraud, force, or coercion.” 32 So.3d at 14.
The supreme court has explained the following regarding whether a defendant is justified in interfering with business relations:
“ ‘Whether a defendant’s interference is justified depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the surrounding circumstances. Restatement (Second) of Torts § 767 (1979), and Comments. The restatement utilizes the term “improper” to describe actionable conduct by a defendant. Non-justification is synonymous with “improper.” If a defendant’s interference is unjustified under the circumstances of the case, it is improper. The converse is also true. Section 767 of the Restatement lists, and the Comments explain, several items that we consider to be among the important factors to consider in determining whether a defendant’s interference is justified:
“ ‘ “(a) the nature of the actor’s conduct,
“ ‘ “(b) the actor’s motive,
“ ‘ “(c) the interests of the other with which the actor’s conduct interferes,
“‘“(d) the interests sought to be advanced by the actor,
“ ‘ “(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
“ ‘ “(f) the proximity or remoteness of the actor’s conduct to the interference, and
““‘(g) the relations between the parties.”
“ ‘Restatement (Second) of Torts § 767 (1979).’
“[Gross v. Lowder Realty Better Homes & Gardens,] 494 So.2d [590,] 597 n. 3 [ (Ala.1986) ].”
White Sands, 32 So.3d at 12-13.
In White Sands, our supreme court held that “[justification is generally a jury question,” unless a defendant presents evidence, such as affidavits and depositions, that is not controverted. White Sands, 32 So.3d at 18 (citing Specialty Container Mfg., Inc. v. Rusken Packaging, Inc., 572 So.2d 403, 408 (Ala.1990)).
In the trial court, Newport’s argument that its interference was justified was based on its assertion that it had been assigned the noncompete agreement and therefore had the authority to enforce that agreement. Concluding that the noncom-pete agreement had been assigned to Newport, the trial court, therefore, determined that Newport’s actions had been justified. Because we are reversing the trial court’s decision as to whether Newport had been assigned the noncompete agreement and therefore had the authority to enforce that agreement, it is necessary to engage in a factual inquiry to determine whether Newport’s interference with Booth’s relationship with the competing station was justified. In determining whether a genuine issue of material fact exists, we are required to construe the *729 evidence in the light most favorable to the nonmoving party, which in this case is Booth. See Miller, supra. In light of the fact that Newport was not authorized to enforce the noncompete agreement, we hold that a genuine issue of material facts exists as to whether Newport was justified in interfering with Booth’s relationship with the competing station.
Based on the foregoing reasons, we reverse the judgment of the trial court, and we remand this case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and BRYAN and THOMAS, JJ., concur.
MOORE, J., concurs in part and concurs in the result, with writing.

. At the time the affidavit was filed, Newsom served as vice president, assistant secretary, and associate general counsel of Clear Channel.

. Booth was initially hired in March 2004 as a sales associate for WJTC, one of Clear Channel's television stations. In March 2005, Booth became employed as an account executive for WPMI, another television station owned by Clear Channel. Booth worked exclusively for WPMI for approximately one year, and thereafter she began working as an account executive for both WPMI and WJTC.

. Newport argues that the fact that the purchase agreement does not mention noncom-pete agreements among the assets that are excluded from the purchase agreement is indicative of Clear Channel’s intent to assign noncompete agreements. We disagree. The fact that Clear Channel intended to specify certain categories of excluded assets does not contradict its express intent (in Article 2.8) to assign the contracts identified in Article 1.1(d), some of which were listed in Schedule 1.1(d).

. The trial court’s oversight is apparent; in quoting Article 1.1(d) in its summary judgment, it omitted the last, crucial clause of subsection (ii) relating to the period between when the purchase agreement was executed and the closing.

. Notably, Article 2.8 includes examples of the types of contracts listed on the schedule; although employment contracts are among the types of contracts listed, noncompete agreements are not explicitly mentioned.

.Newsom’s affidavit stated that Booth’s employment contract was explicitly assigned to Newport in another section of the purchase agreement; however, our review of the purchase agreement and the rest of the record on appeal reveals no such explicit assignment of Booth's employment contract to Newport.

. We, therefore, need not address Booth’s argument that Newsom’s affidavit should have been struck from the record.